**Docket No. 22-35818**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

———— • ————

FLI-LO FALCON, LLC, STEEL CITY EAGLES CORP.
and STELVIO TRANSPORT LLC,

*Plaintiffs-Appellants,*

v.

AMAZON.COM, INC. and AMAZON LOGISTICS, INC.,

*Defendants-Appellees.*

_____

*Appeal from a Decision of the United States District Court for the Western District of Washington,
No. 2:22-cv-00441-RSM-MLP · Honorable Ricardo S. Martinez*

## BRIEF OF APPELLANTS

ANDREW M. MCNEELA
DANIEL HUME
KIRBY MCINERNEY LLP
250 Park Avenue, Suite 820
New York, New York 10177
(212) 371-6600 Telephone
(212) 751-2540 Facsimile
amcneela@kmllp.com
dhume@kmllp.com

*Attorneys for Appellants,
Fli-Lo Falcon, LLC, Steel City Eagles Corp.
and Stelvio Transport LLC*



PRINTED ON RECYCLED PAPER



## CORPORTATE DISCLOSURE STATEMENT

Plaintiff Fli-Lo Falcon, LLC has no parent company and no publicly held company owns more than 10% of its stock. Plaintiff Steel City Eagles, Corp. has no parent company and no publicly held company owns more than 10% of its stock. Plaintiff Stelvio Transport LLC is wholly owned by STEO Group Inc., which is a non-public company. No publicly held company owns more than 10% of Stelvio Transport LLC's or STEO Group Inc.'s stock.

Dated: February 22, 2023

 /s/ Andrew M. McNeela
Andrew M. McNeela

# TABLE OF CONTENTS

CORPORTATE DISCLOSURE STATEMENT.................................................. i

TABLE OF AUTHORITIES ............................................................... v

INTRODUCTION ........................................................................ 1

STATEMENT OF JURISDICTION......................................................... 5

STATEMENT OF THE ISSUES........................................................... 6

STATEMENT OF THE CASE ............................................................. 7

    I.    Factual Background............................................................ 7

        A.    Amazon's DSP Program and Its Recruitment of Individuals .......... 7

        B.    The DSP Agreement ....................................................... 9

        C.    Amazon's Domination of Its DSPs' Business Activities............... 11

        D.    Amazon's Abuse of the DSP Program to Enrich Itself at the DSPs' Expense ............................................................. 13

    II.    Procedural History............................................................ 16

        A.    Plaintiffs' Commencement of this Action and Amazon's Motion to Compel Arbitration ....................................................... 16

        B.    The Magistrate Judge's Report and Recommendation ................. 17

        C.    The District Court's Order and Plaintiffs' Appeal......................... 18

STANDARD OF REVIEW ................................................................ 18

SUMMARY OF ARGUMENT ............................................................. 19

ARGUMENT ........................................................................... 22

    I.    The District Court Erred in Concluding that Plaintiffs Are Subject to Mandatory Arbitration Under the FAA.................................... 22

A.      Relevant Statutory Background ....................................................22

B.      The DSP Agreement Qualifies Under the FAA's Exception to
         Mandatory Arbitration ................................................................23

        1.      There is No Dispute that the DSPs and all Their
                 Personnel Engaged in Interstate Transportation Work........24

        2.      The DSP Agreement Is a "Contract of Employment"
                 Within the Meaning of the Exception.................................25

                i.      The Exception's Plain Language Supports
                         Plaintiffs' Position....................................................25

                ii.     The District Court's Ruling Undermines the
                         Exception's Purpose, and Is Irreconcilable with
                         this Court's Decisions in *Romero* and *Rittmann* .......29

                iii.    The District Court's Distinction Between
                         "Contracts of Employment" and "Commercial
                         Agreements" Is Contrary to the Facts of this Case
                         and Exalts Form Over Substance .............................32

                iv.     The District Court's and Amazon's Remaining
                         Arguments Are Meritless .........................................36

II.     Amazon Cannot Rely on Washington Law to Salvage the District
         Court's Erroneous Arbitration Order .......................................38

        A.      This Court's Precedents Concerning Choice of Law
                 Provisions in Agreements that Include Arbitration Clauses..........39

        B.      The DSP Agreement Does Not Evidence the Requisite Clear
                 Intent to Incorporate the WUAA ...................................40

III.    Even if Washington Law Applies, the Arbitration Provision Is
         Unenforceable Because It Is Unconscionable..........................................46

        A.      The District Court Erred in Determining that the Parties
                 Clearly and Unmistakably Delegated Threshold Issues of
                 Arbitrability to the Arbitrator.........................................46

B.    The DSP Agreement Is Substantively and Procedurally Unconscionable Under Washington Law ......................................49

    1.    Law Regarding Arbitration and Unconscionability ...........49

    2.    The Arbitration Provision Is Procedurally Unconscionable....................................................................49

    3.    The Arbitration Provision Is Substantively Unconscionable...................................................................53

        i.    The Agreement Violates Washington State Public Policy........................................................................54

        ii.    The DSP Agreement Is Shockingly One-Sided ........58

CONCLUSION ...................................................................................60

STATEMENT OF RELATED CASES ....................................................61

CERTIFICATE OF COMPLIANCE.......................................................62

CERTIFICATE OF SERVICE ...............................................................63

ADDENDUM ......................................................................................64

iv

# TABLE OF AUTHORITIES

**Cases:**

*Acosta v. Jani-King of Okla., Inc.*,
905 F.3d 1156 (10th Cir. 2018) .................................................................31

*Adler v. Fred Lind Manor*,
103 P.3d 773 (Wash. 2004) ........................................................ 49, 50, 52

*Am. Online, Inc. v. Super. Ct.*,
108 Cal. Rptr. 2d 699 (Cal. Ct. App. 2001) .............................................55

*Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Emps. of Am., Local
Div. 1210 v. Pa Greyhound Lines, Inc.*,
192 F.2d 310 (3d Cir. 1951) .....................................................................28

*Becerra v. Expert Janitorial, LLC*,
332 P.3d 415 (Wash. 2014) ......................................................................35

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) ........................................................... 46, 47

*Burnett v. Pagliacci Pizza, Inc.*,
470 P.3d 486 (Wash. 2020) ............................................................ *passim*

*Carter O'Neal Logistics, Inc. v. FedEx Ground Package Sys., Inc.*,
No. 17 Civ. 02799, 2020 WL 13111153
(W.D. Tenn. Mar. 19, 2020) .....................................................................36

*Cent. States, Se. and Sw. Areas Pension Fund v. Cent. Cartage Co.*,
84 F.3d 988 (7th Cir. 1996) ......................................................................27

*Circuit City Stores, Inc. v. Adams*,
532 U.S. 105 (2001) ........................................................... 23, 24, 27, 29

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) ..................................................................................31

*Cornelius v. Alpha Kappa Lambda*,
502 P.3d 910 (Wash. Ct. App. 2021) .......................................................50

*D.V.C. Trucking, Inc. v. RMX Global Logistics*,
No. 05 Civ. 00705, 2005 WL 2044848 (D. Colo. Aug. 24, 2005)...........37

*Dix v. ICT Grp, Inc.*,
　　161 P.3d 1016 (Wash. 2007) ...................................................................55

*Dupler v. Orbitz, LLC*,
　　No. 18 Civ. 2303, 2018 WL 6038309 (C.D. Cal. July 5, 2018) .............47

*Eiess v. USAA Fed. Sav. Bank*,
　　404 F. Supp. 3d 1240 (N.D. Cal. 2019) ..................................................47

*Fid. Fed. Bank, FSB v. Durga Ma Corp.*,
　　386 F.3d 1306 (9th Cir. 2004) ..................................................... 39, 41, 45

*Gandee v. LDL Freedom Enters., Inc.*,
　　293 P.3d 1197 (Wash. 2013) ...................................................................49

*Godfrey v. Hartford Cas. Ins. Co.*,
　　16 P.3d 617 (Wash. 2001) .......................................................................38

*Golden v. O'Melveny & Meyers LLP.*,
　　No. 14 Civ 8725, 2016 WL 4168853
　　(C.D. Cal. Aug. 3, 2016) ................................................................. 39, 42

*Hernandez v. Johnson & Johnson*,
　　No. 20 Civ 5136, 2021 WL 320612 (E.D. Wash. Jan. 8, 2021) .............57

*Hollingbery v. Dunn*,
　　411 P.2d 431 (Wash. 1966) .....................................................................35

*In re Mortgage Elec. Registration Sys., Inc.*,
　　754 F.3d 772 (9th Cir. 2022) ...................................................................24

*Ingalls v. Spotify USA, Inc.*,
　　No. 16 Civ. 03533, 2016 WL 6679561 (N.D. Cal. Nov. 14,  2016) ........47

*Int'l Bhd. of Teamsters v. NASA Servs., Inc.*,
　　957 F.3d 1038 (9th Cir. 2020) ........................................................ 18, 35

*Invesco High Yield Fund v. Jecklin*,
　　10 F.4th 900 (9th Cir. 2021) ....................................................................26

*Johnmohammadi v. Bloomingdale's Inc.*,
　　755 F.3d 1072 (9th Cir. 2014) ...................................................................6

*JZK, Inc. v. Coverdale*,
　　No. Civ. 46465–9, 2016 WL 236481
　　(Wash. Ct. App. Jan. 19, 2016) ..............................................................49

vi

*Liss v. Exel Transp. Servs., Inc.*,
No. 04 Civ. 2001, 2005 WL 8161076 (D. Ariz. Sept. 30, 2005) .............25

*Luna v. Household Fin. Corp. III.*,
236 F. Supp. 2d 1166 (W.D. Wash. 2002) ................................................55

*MacClelland v. Cellco P'ship*,
No. 21 Civ. 08592, 2022 WL 2390997 (N.D. Cal. July 1, 2022) ............47

*Magill v. Wells Fargo Bank, N.A.*,
No. 21 Civ. 01877, 2021 WL 6199649 (N.D. Cal. June 25, 2021) .........47

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
514 U.S. 52 (1995) ........................................................................... 42, 45

*Mayne v. Monaco Enters., Inc.*,
361 P.3d 264 (Wash. Ct. App. 2015) ............................................... *passim*

*McKee v. AT&T Corp.*,
191 P.3d 845 (Wash. 2008) ............................................................. 49, 55

*Meadows v. Dickey's Barbeque Rest. Inc.*,
144 F. Supp. 3d 1069 (N.D. Cal. 2015) ........................................... 47, 48

*Mikhak v. Univ. of Phoenix*,
No. 16 Civ. 00901, 2016 WL 3401763 (N.D. Cal. June 21, 2016) .........47

*Miller v. Amazon.com, Inc.*,
No. 21 Civ. 00204, 2021 WL 5847232
(W.D. Wash. Dec. 9, 2021) ............................................................. 25, 44

*Money Mailer, LLC v. Brewer*,
No. 15 Civ. 1215, 2016 WL 1393492, (W.D. Wash. Apr. 8, 2016) ........47

*Morgan v. Sundance, Inc.*,
142 S. Ct. 1708 (2022) ................................................................... 22, 47

*Nagrampa v. MailCoups, Inc.*,
469 F.3d 1257 (9th Cir. 2006).................................................................48

*New Prime, Inc. v. Oliveira*,
139 S. Ct. 532 (2019) ..................................................................... 23, 26

*Oliveira v. New Prime, Inc.*,
857 F.3d 7 (1st Cir. 2017) .......................................................................28

*Olson v. The Bon, Inc.*,
    183 P.3d 359 (Wash. Ct. App. 2008) ......................................................55

*Palcko v. Airborne Express, Inc.*,
    372 F.3d 588 (3d Cir. 2004) ............................................................ 25, 43

*R&C Oilfield Servs., LLC v. Am. Wind Transp. Grp.*,
    447 F. Supp. 3d 339 (W.D. Pa. 2020) ....................................................37

*Rimov v. Schultz*,
    253 P.3d 462 (Wash. Ct. App. 2011) ......................................................38

*Rittmann v. Amazon.com, Inc.*,
    971 F.3d 904 (9th Cir. 2020) ........................................................ *passim*

*Romero v. Watkins & Shepard Trucking, Inc.*,
    9 F.4th 1097 (9th Cir. 2021) ......................................................... *passim*

*Romero v. Watkins and Shepard Trucking, Inc.*,
    No. 20 Civ. 55768, 2021 WL 3675074 (9th Cir. Aug. 20, 2021) ............43

*Ross v. Blake*,
    578 U.S. 632 (2016) ...............................................................................26

*Scott v. Cingular Wireless*,
    161 P.3d 1000 (Wash. 2007) ........................................................ *passim*

*SEIU Loc. 121RN v. Los Robles Reg'l Med. Ctr.*,
    976 F.3d 849 (9th Cir. 2020) ..................................................................18

*Sovak v. Chugai Pharm. Co.*,
    280 F.3d 1266 (9th Cir. 2002) .................................................... 39, 41, 42

*Sw. Airlines Co. v. Saxon*,
    142 S. Ct. 1783 (2022) ...........................................................................25

*Szetela v. Discover Bank*,
    118 Cal. Rptr. 2d 862 (Cal. Ct. App. 2002) ................................ 56, 57, 58

*Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers of Am.*,
    207 F.2d 450 (3d Cir. 1953) ...................................................................28

*The Clei Grp. LLC v. Amazon Logistics, Inc.*,
    No. 22 Civ. 1749 (S.D. Tex. May 31, 2022)...........................................33

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*,
    925 F.2d 1136 (9th Cir. 1991) ................................................................19

*Totten v. Kellogg, Brown & Root*,
    152 F. Supp. 3d 1243 (C.D. Cal. 2016) .................................................35

*Townsend v. Quadrant Corp.*,
    224 P.3d 818 (Wash. Ct. App. 2009) .........................................55

*Unite Here Local 30 v. Sycuan Band of the Kumeyaay Nation*,
    35 F.4th 695 (9th Cir. 2022) ......................................................18

*United Elec., Radio & Mach. Workers of Am. v. Miller Metal Prods., Inc.*,
    215 F.2d 221 (4th Cir. 1954) ....................................................28

*Vargas v. Delivery Outsourcing, LLC*,
    No. 15 Civ. 03408, 2016 WL 946112 (N.D. Cal. Mar. 14, 2016) ..........47

*Wolsey, Ltd. v. Foodmaker, Inc.*,
    144 F.3d 1205 (9th Cir. 1998) ..................................................40

*Zamora v. Swift Transp. Corp.*,
    No. 07 Civ. 00400, 2008 WL 2369769 (W.D. Tex. June 3, 2008) .........25

*Zuver v. Airtouch Commc'ns, Inc.*,
    103 P.3d 753 (Wash. 2004) .....................................................50

**Statutes:**

28 U.S.C § 1291 ..............................................................................6

    § 1332 .....................................................................................5

9 U.S.C. § 1 .................................................................. 1, 23, 26

    § 2 ...........................................................................................22

RCW § 19.100.190 .......................................................................54

    § 19.86.090 ..................................................................... 56, 58

    § 7.04A .....................................................................................5

**Other Authorities:**

3 William Dwight Whitney, *The Century Dictionary: An Encyclopedic
    Lexicon of the English Language* 4087 (ed. 1914) ...................................27

Noah Webster, *Webster's Practical Dictionary* 271 (ed. 1910) ......................27

*Webster's Collegiate Dictionary* 670 (3d ed. 1919) ...........................................27

# INTRODUCTION

The central issue raised by this appeal – which is an issue of first impression in this Circuit as well as its sister circuits – is whether the Federal Arbitration Act's exclusion "of contracts of employment of . . . any other class of workers engaged in foreign or interstate commerce [*i.e.*, transportation workers]" from mandatory arbitration, 9 U.S.C. § 1 (the "Exception"), applies where the party opposing arbitration is a business entity. As discussed below, the district court – in a textbook example of elevating form over substance – erroneously concluded that the Exception applies only where the contracting party is a natural person and granted Amazon's motion to compel arbitration.[1]

By way of summary, this putative class action concerns Amazon's Delivery Service Partner ("DSP") program. Pursuant to that program, Amazon recruited *individuals* to deliver packages to its customers across the country. Once accepted, however, Amazon required those individuals to create new, intermediary business entities (the "DSPs"), as a precondition to entering the program. Amazon then required each of those individuals to execute a standard form adhesion contract on behalf of their newly formed DSP (the "DSP Agreement"). The plaintiffs in this

---

[1] The Defendants are Amazon.com, Inc. and Amazon Logistics, Inc. ("ALI") (collectively, "Amazon").

action, Fli-Lo Falcon, LLC, Steel City Eagles, Corp., and Stelvio Transport LLC (collectively, "Plaintiffs") are former DSPs.

Although the DSP Agreement purported to establish an independent contractor relationship, Amazon nonetheless controlled virtually all aspects of the DSPs' business, including the day-to-day activities of their delivery personnel. Thus, while the DSP Program appeared aimed at outsourcing delivery services, this was just a façade. Rather, the DSP Program, at its heart, is a cynical bid to maintain all the control of an employer, while foisting all employment related costs and liabilities that Amazon should rightfully have borne onto its DSPs.

Adding insult to injury, Amazon has continuously and unilaterally increased the performance metrics needed to qualify for incentive awards – a DSP's lifeblood – to squeeze as much efficiency from its DSPs as possible while paying them as few incentive awards as possible. And when all this becomes too much to bear, Amazon imposes ruinous exit fees upon any DSPs that seek to exit the program.

As discussed below, the district court's ruling that the Exception does not apply to the DSP Agreement because the DSPs are "independent" business entities (i) is contrary to the Exception's plain language and applicable Supreme Court precedent, (ii) undermines Congress's aim in enacting the Exception, (iii) is irreconcilable with this Court's decision in *Rittmann v. Amazon.com, Inc.*, 971 F.3d

2

904 (9th Cir. 2020), and (iv) ignores key allegations undermining the factual premises upon which the district court based its decision.

However, a proper analysis of the district court's ruling first requires a discussion of what is *not* disputed. *First*, there is no dispute that the DSPs were hired to perform transportation work falling within the Exception's ambit. *Second*, there is no dispute that *all* the DSPs' personnel performed qualifying transportation work.[2] Accordingly, there can be no dispute that if Amazon had contracted with the DSPs' proprietors or delivery personnel *directly for the exact same work*, the Exception would apply.

Thus, when properly framed, the question for this Court is whether the law permits Amazon to transform relationships that would be covered by the Exception into relationships that are not covered, simply by requiring the individuals that it recruited to form and contract through intermediary business entities. The answer is a resounding no.

*First*, the Exception's plain text, as well as Supreme Court precedent broadly construing the term "contracts of employment," make clear that the Exception encompasses contracts, including those creating independent contractor

---

[2] Amazon did not dispute either of these issues in its motion to compel arbitration, and instead only argued that the Exception was inapplicable because the DSP Agreement does not qualify as "a contract of employment," because it is between two business entities. *See* Excerpted Record ("ER") ER-28–31, 93–94.

3

relationships, that call for the performance of work by transportation workers. Thus, it is not the legal status of the signatory to the agreement, but the substance of work that matters. And here, the DSP Agreement plainly calls for the provision of delivery services by transportation workers.

*Second*, the Exception embodies Congress's "demonstrated concern" that transportation workers – who play a pivotal role in the movement of goods and therefore the economy – be exempted from mandatory arbitration under the Federal Arbitration Act ("FAA"), *unlike all other workers*. However, the district court's ruling – that only natural persons can invoke the Exception – would eradicate that distinction. This is because it would permit large companies with superior bargaining power, like Amazon, to require the transportation workers that they hire to form and contract through intermediary business entities, thereby rendering them subject to mandatory arbitration *like all other workers*. This is not a hypothetical concern, given the relative ease with which even unsophisticated individuals can affordably form business entities by using over-the-counter corporate formation products.

*Third*, and relatedly, the district court decision is irreconcilable with *Rittmann*. There, this Court held that Amazon's "flex drivers" – who perform delivery work virtually indistinguishable from the DSPs – are exempt from mandatory arbitration under the Exception. As noted above, however, the district court's decision would

enable Amazon to easily circumvent *Rittmann's* ruling by requiring its flex drivers to create and contract through intermediary business entities (as it did with its DSPs).

*Lastly*, notwithstanding that the district court premised its ruling on the purported fact that the DSPs were "independent" business entities, the undisputed facts establish just the opposite. Simply put, the DSPs exist only because Amazon required the individuals it recruited to create them, and thereafter Amazon controlled every aspect of the DSPs' business, from hiring and firing decisions, to employee compensation, to the order in which packages were to be delivered, to the delivery vehicles the DSPs could use, to even the clothes the DSPs' personnel wore, *etc*.

Separately, Amazon argued before the district court that even if arbitration cannot be compelled under the FAA, it nonetheless can be compelled under the Washington Uniform Arbitration Act ("WUAA"), RCW § 7.04A, *et. seq*., and Amazon is sure to raise that argument here. Amazon's position, however, is meritless because the DSP Agreement does not clearly evidence the parties' intent to incorporate the WUAA. In any event, the DSPs cannot be compelled to arbitrate under the WUAA even if it applied – which it does not – because the arbitration clause is both procedurally and substantively unconscionable.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d)(2), as amended by the Class Action Fairness Act of

2005, Pub. L. No. 109-2, 119 Stat. 4, because the Plaintiffs and Amazon are citizens of different states, the proposed class consists of at least several thousand members, and the amount in controversy exceeds $5,000,000. (¶¶ 1, 12, 15-17).[3] This Court has appellate jurisdiction under 28 U.S.C § 1291, because the district court's decision compelling arbitration and dismissing the action constitutes a final appealable order, *see Johnmohammadi v. Bloomingdale's Inc.*, 755 F.3d 1072, 1074 (9th Cir. 2014), and because Plaintiffs filed their notice of appeal within 30 days of the district court's judgment. (ER-3, 161-63, 170).

## STATEMENT OF THE ISSUES

1.     Whether a business entity qualifies under the FAA's Exception to mandatory arbitration where the contract at issue calls for the performance of transportation work indisputably covered by the Exception, and where every natural person associated with that business entity performs qualifying transportation work.

2.     Whether Amazon can circumvent the Exception by recruiting *individuals* to perform qualifying transportation work but then requiring them to form intermediary business entities as a condition of doing business, where Amazon maintains complete control over the newly formed businesses.

---

[3] Unless otherwise noted, all citations to "(¶ __)" herein are to paragraphs of the Amended Class Action Complaint ("ACAC"), which is found at ER-104–160.

6

3.     Whether Amazon can compel arbitration under Washington law when (i) the DSP Agreement, which was drafted solely by Amazon, specifies that it is governed by the FAA but does not clearly evidence the parties' intent to incorporate the WUAA, and (ii) any ambiguities must be construed against Amazon.

4.     Whether, assuming *arguendo* that the WUAA applies, Amazon can compel arbitration when the DSP Agreement's arbitration clause is both procedurally and substantively unconscionable.

## STATEMENT OF THE CASE

## I.     Factual Background

### A.     Amazon's DSP Program and Its Recruitment of Individuals

Amazon.com, Inc. is the world's largest online retailer, and, as of October 2021, accounted for approximately 41% of the United States' e-commerce market. (¶¶ 1, 21).  Amazon.com, Inc. "sells its own products and provides fulfillment services for third-party sellers who also sell their products on Amazon.com." *Rittmann*, 971 F.3d at 907.  ALI is a wholly owned subsidiary of Amazon.com, Inc., which provides delivery and transportation services to Amazon.com, Inc.  (¶¶ 1, 18, 22-23).

ALI provides such services primarily through its DSP Program.  Under that program, ALI contracts with small businesses, known as DSPs, to deliver Amazon's packages to its customers.  (¶¶ 1, 23).  The typical DSP operates approximately 20-

40 Amazon-branded vans, one for each delivery route assigned by ALI, and employs a similar number of delivery personnel. (¶¶ 1, 45). As of December 2021, Amazon's DSP Program consisted of approximately 2500 DSPs, located throughout the country. (¶ 1). The version of the DSP Program that is the subject of this action is the 2.0 DSP Program, which Amazon instituted in or about 2018. (¶ 27).

Although Plaintiffs, like all DSPs, are business entities, Amazon only recruits individuals and *does not* permit preexisting businesses or groups of individuals to apply to the DSP Program. (ER-151 (Amazon's DSP marketing materials seeking "entrepreneurs across the country to launch and operate their own package delivery business"); *see also* https://logistics.amazon.com/marketing/getting-started (ALI's website describing the DSP application process and explaining that "[t]he DSP opportunity is available *to individuals looking to start their own business*," and that "we *don't accept* applications *from companies*, couples, or groups")).[4]

Rather, once Amazon accepts an individual's application, it then requires that individual to create a new, intermediary business entity as a precondition to participating in the DSP Program. (ER-40 ¶ 3, ER-42 ¶ 3, ER-45 ¶ 3; *see also* ER-153 (Amazon explaining, under the heading "What it takes to start your business," that DSPs will "need" to "*create [their] business entity* and officially become a delivery business owner")).

---

[4] Unless otherwise noted, all emphasis contained herein is added.

Amazon advertised its DSP Program to potential applicants via uniform marketing materials, (ER-150–60), which touted a host of services that Amazon provided to approved applicants to help them create their delivery business, (ER-152–53, 157), as well as "three weeks of hands-on training" for approved applicants at its Seattle, Washington campus and "in the field working alongside existing [DSP] owners and drivers," (ER-152, 155, 159).

Applicants who were accepted to the program and became DSP owners were responsible for, *inter alia*, managing their delivery personnel's performance of their routes, and often assisted with the loading/organizing of packages into delivery vans each day at Amazon's fulfillment centers (*i.e.*, warehouses), as well as the actual delivery of Amazon's packages to its customers. (ER-40–41 ¶¶ 9-11; ER-43–44 ¶¶ 10-11; ER-46 ¶ 9).

### B.    The DSP Agreement

Amazon required approved applicants to execute on behalf of their newly formed DSPs, a standard form adhesion contract that Amazon drafted without input from the DSPs' owners, and which Amazon presented on a take-it-or-leave-it basis ("DSP Agreement"). (ER-40 ¶ 4, ER-42–43 ¶ 4, ER-46 ¶ 4, ER-50–55).[5]

---

[5] Amazon updated the DSP Agreement three times during the 2.0 DSP Program. (ER-50–69 (annexing versions of the DSP Agreements last updated August 2018, February 2020, and October 2021)). Because there are no material differences between the versions of the DSP Agreement as they relate to the issues raised by this appeal, this brief cites to the August 2018 version, unless otherwise noted.

Pursuant to that agreement, Amazon hired its DSPs to provide "transportation, delivery, and related services," to be performed "by the business entities that you represent," in accordance with certain separately issued "Program Policies." (ER-50 (introductory paragraph)). The DSP Agreement classifies the DSPs as "independent contractor[s] of Amazon" that purportedly have "*exclusive responsibility* for [their] Personnel, including *exclusive control* over compensation, hours, and working conditions." (ER-54 § 10).

Given that the DSPs had no opportunity to negotiate the DSP Agreement, its provisions, unsurprisingly, are extremely one-sided in Amazon's favor without any reciprocal rights provided to the DSPs or obligations imposed on Amazon. (*See, e.g.*, ER-51–52 § 5(a)-(b) (setting forth Amazon's non-reciprocal audit, data collection, and confidentiality rights)). Most notably, the DSP Agreement: (i) purports to limit both the type and amount of damages a DSP can recover from Amazon, while providing no limit on the damages Amazon can recover from its DSPs, (ER-52–54 §§ 6(d), 11; *see also* ER-54 § 12 (setting forth non-reciprocal indemnification rights)); and (ii) grants Amazon the unilateral right to amend/modify the DSP Agreement, including all separately issued Program Policies, at any time, (ER-50, 55 §§ 1(c), 14).

### C.    Amazon's Domination of Its DSPs' Business Activities

Despite representing in both its marketing materials and the DSP Agreement that DSP owners, as purported independent contractors, would possess a substantial level of autonomy, in practice Amazon controlled virtually all aspects of its DSPs' business activities, including the day-to-day activities of the DSPs' delivery personnel.  (¶¶ 42(a)-(y), 70-96; *see also* ER-71–80 (Amazon's DSP Program Policies)).  Amazon's control included the following:

- *General Business Operations* – Amazon established books and records and insurance requirements for its DSPs and required them to provide Amazon with unfettered access to their records – including pay stubs, insurance certificates, *etc.* – and/or their physical offices, within 24 hours of a request.  (ER-64–66 §§ 5, 8; ER-71 § A(1)-(2)).  Amazon further required DSPs to use "ADP payroll and time tracking software and to allow Amazon access to [the DSPs' payment data] for audit purposes."  (ER-73–74 § G).

Amazon (i) forbid its DSPs from hiring independent contractors without prior authorization; (ii) required its DSPs to classify their workers as employees; and (iii) required the DSPs' delivery personnel to "sign and agree to an arbitration agreements with a class action waiver."  (ER-72–73 § F).

Amazon further required its DSPs to use only delivery vans that met Amazon's "vehicle specifications," (ER-72 § C), and forbid them from using vans

with non-Amazon branding. (*Id.*). Amazon also required its DSPs to install video cameras in their vans and required the DSPs' personnel to install geo-tracking software (among other applications) on their cell phones. (¶¶ 78, 80; *see also* ER-65 § 5(b)). In this connection, Amazon required its DSPs to provide it with access to all data concerning their personnel's location, movement, and speed of travel. (ER-65 § 5(b)). Lastly, the DSPs did not determine the price of the services they provided to Amazon but were paid pursuant to rates Amazon unilaterally set. (ER-78–79).

- *Personnel Decisions* – Amazon: (i) set hiring standards for the DSPs personnel and had to pre-approve hires, (¶¶ 42(d), 46, 74-75; ER-72–73 § F); (ii) required the DSPs to administer background checks and drug tests "in accordance with Amazon's standards," (ER-72–73 § F); and (iii) at times, directed the DSPs to discipline or terminate workers, (¶¶ 6, 42(f), 85, 87). Amazon also: (i) required its DSPs to pay their personnel pursuant to payment terms Amazon set, (ER-73–74 § G); (ii) established minimum compensation levels for the DSPs' personnel, (*id.*); (iii) decided which workers were entitled to bonuses, (¶¶ 42(v), 149; ER-79 § G); and (iv) ordered the DSPs to make bonus payment to those workers, (*id.*). Amazon also imposed rules of conduct for the DSPs' personnel, as well as dress codes and grooming standards. (¶¶ 42(i), 77, 149; ER-51 §§ 4(a)(ii)(A), (E), 4(b); ER-74 §§ H, J).

12

- *Provision of Delivery Services/Oversight of Delivery Personnel* – All delivery routes and the number of packages per route were set by Amazon. (¶¶ 48, 52, 53, 59). Amazon dictated the time of the day when the DSPs could begin their routes and set the order in which the DSP had to deliver the packages for a given route. (¶¶ 81-83). Amazon tracked the DSPs' personnel's performance on a real-time basis, *via* the geolocation and other applications it required them to download, and communicated work instructions *directly* to the DSPs' delivery personnel on a daily basis. (¶ 42(e), (p), (s), (t); *see also* ¶¶ 78-80, 84).

Thus, while the DSPs ostensibly were independent contractors of Amazon, functionally their delivery personnel were Amazon employees and the DSPs' owners served as Amazon's mid-level managers. (¶ 72). Thus, Amazon used its DSP Program to exercise all the control of an employer, while foisting responsibility for certain costs that it rightfully should have borne – such as liability for accidents, unemployment benefits, workers' compensation benefits, and overtime wages, *etc.* – onto its DSPs. (¶¶ 2, 6, 61, 68, 88).

## D. Amazon's Abuse of the DSP Program to Enrich Itself at the DSPs' Expense

Amazon's complete control of its DSPs' business activities severely hamstrung the DSPs' ability to manage/reduce their operating expenses, thereby significantly restricting or eliminating the DSPs' ability to turn a profit. (¶¶ 36, 128). Further still, as discussed below, Amazon continuously and unilaterally altered

performance standards to extract greater efficiency from its DSPs, while using the DSPs' failure to meet its increasingly strict requirements as a basis for paying them as little as possible. (¶¶ 99-102).

Amazon paid its DSPs pursuant to rate structures set forth in its Program Policies, which include: (i) a monthly base rate paid per vehicle; (ii) an hourly base rate paid "per assigned route length hour," *i.e.*, the amount of time Amazon unilaterally determined it should take for a given route to be completed; and (iii) a per-piece rate per successfully delivered package. (ER-78). Amazon also paid its DSPs incentive awards pursuant to certain "incentive and bonus programs," which were critical to the DSPs achieving profitability. (¶¶ 7–8, 101, 114; ER-79 § G).

Since the DSP Program's inception, however, Amazon has applied its trademark ruthless analytics to refine its payment terms *so that it paid its DSPs less for more work*, thereby reducing its own costs. (¶¶ 100–13). For example, Amazon set the amount of time in which a route should be completed, but when those time frames proved unworkable, Amazon required the DSPs to pay their delivery personnel any overtime they incurred for the additional time it took to complete the route. (¶¶ 61-66).

Similarly, because the rate Amazon paid its DSPs per route (which was a combination of the monthly base rate and the hourly base rate) was considerably higher than the rate it paid per package, Amazon frequently reduced the number of

routes it assigned to its DSPs while increasing the number of packages they had to deliver per route.  (¶ 60).

Amazon similarly played games with its weekly incentive awards.  (¶¶ 98-119).  Amazon purportedly determines whether a DSP is entitled to an incentive award pursuant to a "matrix" of factors unilaterally set by Amazon.  (¶ 102).  Notably, Amazon has steadfastly refused to disclose the factors comprising its matrix, or how Amazon weighs those factors in calculating if an incentive award is due and, if so, the amount to be paid.  (¶¶ 102, 112-13).

Nonetheless, certain aspects of Amazon's matrix/decision-making process can be deduced from the rare occasions when Amazon provided an explanation as to why a DSP did not earn an incentive award.  One factor Amazon apparently considers are so-called "driver defects," which is an umbrella term for any actions taken by the DSP's delivery personnel that Amazon subjectively deems problematic. (¶¶ 103-12).

For example, "driver defects" include customer complaints, no matter how trivial or unsubstantiated.  (¶¶ 103-09).  Even worse, Amazon *incentivizes* customer complaints by providing its customers with complaint-based compensation.  (¶ 110).  Amazon also appears to assess driver defects for certain minor alleged traffic infractions, such as when a DSP's delivery personnel purportedly fail to rest at a stop sign for a sufficient amount of time, or if they do not put their seat belts on

15

immediately after completing a delivery.  (¶¶ 74–75 §§ J, K).  Amazon applies such driver defects, even in the absence of a duly issued traffic citation, based solely on data it purportedly obtains from the geo-tracking applications and delivery van cameras Amazon mandated for its DSPs.  (¶¶ 42(s), 78, 80).[6]

The result of Amazon's practices is that numerous DSPs are unable to turn a profit or are driven to insolvency.  (¶¶ 36, 123).  Yet, many DSPs find themselves unable to exit the DSP Program because Amazon and/or its required vendors assess the DSPs ruinous exit fees, which are often many multiples larger than DSPs' start-up costs.  (¶¶ 120-26).  Consequently, many DSPs are often forced to declare bankruptcy or to continue their relationship with Amazon beyond the point when they would otherwise have walked away from the venture.  (¶ 123).

II.    **Procedural History**

A.    **Plaintiffs' Commencement of this Action and Amazon's Motion to Compel Arbitration**

Plaintiffs commenced this action on April 5, 2022, and filed the ACAC on May 20, 2022, on behalf of all DSPs that executed a 2.0 Delivery Services Partners Agreement.  (¶ 130; *see also* ER-104, 131).  The ACAC asserts claims for, *inter alia*, breach of contract, breach of the implied covenant of good faith and fair dealing,

---

[6] Amazon, of course, provides no allowance for the fact that the time limitations it places on its DSPs to perform their routes is the cause of these purported defects.

fraud, fraudulent inducement, and violations of Washington's Consumer Protection Act, RCW § 19.86, *et seq*. (¶¶ 135-45).

On June 17, 2022, Amazon moved to compel arbitration under the FAA and, in the alternative, Washington law. (ER-81, 9 n.2). Amazon based its motion on the DSP Agreement's compound "Governing Law; Submission to Arbitration" provision, which states in pertinent part:

> This agreement is governed by the United States Federal Arbitration Act, applicable United States federal law, and Washington state law, without reference to any applicable conflict of law rules. Any dispute arising out of this agreement will be resolved by binding arbitration rather than in court . . . .

(ER-54 § 13 (block capitalizations omitted)).

## B. The Magistrate Judge's Report and Recommendation

On September 8, 2022, the assigned magistrate judge (Hon. Michelle L. Peterson), issued a Report and Recommendation ("R&R") urging the district court to compel arbitration under the FAA and to dismiss Plaintiffs' claims in their entirety without prejudice. (ER-6–21). The R&R, however, did not address Amazon's alternative argument that, if the FAA is inapplicable, arbitration can still be compelled under Washington law. (ER-9 n.2).

The R&R concluded that the Exception did not apply because: (i) Plaintiffs purportedly failed to provide any authority holding that business entities qualified

for the Exception;[7] (ii) three district court cases from outside this Circuit purportedly concluded that the Exception does not apply to business entities; and (iii) the DSP Agreement "largely appeared" to be a run-of-the-mill "commercial agreement" between independent business entities. (ER-6–21).

## C.     The District Court's Order and Plaintiffs' Appeal

Plaintiffs timely filed objections to the R&R on September 22, 2022. (ER-170). The next day, the district court (Hon. Ricardo S. Martinez) summarily adopted the R&R conclusions, without any further analysis. (ER-4–5). The district court entered judgment on September 23, 2022, (ER-3), and Plaintiffs timely filed their Notice of Appeal on October 14, 2022, (ER-161–63).

## STANDARD OF REVIEW

This Court "review[s] an order compelling arbitration *de novo*." *Unite Here Local 30 v. Sycuan Band of the Kumeyaay Nation*, 35 F.4th 695, 700-01 (9th Cir. 2022) (citing *SEIU Loc. 121RN v. Los Robles Reg'l Med. Ctr.*, 976 F.3d 849, 852 (9th Cir. 2020)). When evaluating a motion to compel arbitration, a court is required to "constru[e] all facts and reasonable inferences that can be drawn from those facts in [the] light most favorable to the non-moving party." *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1041 n.1 (9th Cir. 2020) (reversing district court

---

[7](*But see* ER-16 n.5 (acknowledging that the Third Circuit has held that the Exception applies to contracts with labor unions)).

decision compelling arbitration) (citing *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136, 1141 (9th Cir. 1991)).

## SUMMARY OF ARGUMENT

The district court erred in concluding that the Exception is inapplicable to the DSP Agreement because DSPs are business entities, notwithstanding that there is no legitimate dispute that the Exception would apply if Amazon had contracted directly with the DSPs' proprietors and/personnel *for the exact same work*. *See* Point I.B.1, *infra*.

*First*, the Exception's plain language and Supreme Court precedent broadly construing the phrase "contracts of employment" make clear that the Exception applies to independent contractor relationships – such as the one established by the DSP Agreement – where the contract at issue *involves* transportation workers performing qualifying transportation work. *See* Point I.B.2.i. Here, the DSP Agreement easily falls within this definition because there is no dispute that the DSP Agreement calls for qualifying transportation work and all of the DSPs' personnel engaged in such work. *See id.*

*Second*, the district court's ruling undermines the Exception's purpose. *See* Point I.B.2.ii. Specifically, the Exception embodies Congress's "demonstrated concern" that transportation workers – unlike workers in general – would not be subject to mandatory arbitration under the FAA. *See id.* That distinction would be

19

entirely vitiated, however, if the Exception does not apply to business entities because companies, like Amazon, could easily circumvent the Exception by making their transportation workers form and contract through intermediary business entities, thus making those transportation workers subject to mandatory arbitration just like all other workers. *See id.*

Functionally, this is no different than if Amazon had contracted directly with the DSPs' proprietors/personnel but insisted on a contractual provision waiving the Exception, which this Court has ruled in *Romero v. Watkins & Shepard Trucking, Inc.*, 9 F.4th 1097, 1101 (9th Cir. 2021) is impermissible. *See id.* Moreover, the district court's ruling would enable Amazon to perform an end run around this Court's decision in *Rittmann*, simply by requiring its "flex drivers" to create and contract through intermediary business entities like its DSPs. *See id.*

*Third*, the main factual premise underlying the district court's ruling – that the DSPs are "independent" business entities that hired their own transportation workers – is the *exact opposite* of what is alleged. *See* Point I.B.2.iii. Rather, as the record makes clear, Amazon controlled virtually all aspects of the DSPs' business activities, including the day-to-day work of the DSPs' delivery personnel, which were functionally Amazon employees. *See id.*

*Finally*, the three district court decisions – all from outside this Circuit – upon which the district court in this action based its ruling, are all distinguishable and/or

lend support to Plaintiffs' position. *See* Point I.B.2.iv. Accordingly, the DSP Agreement qualifies for the Exception and is not subject to mandatory arbitration under the FAA.

Separately, Amazon is incorrect that Washington law provides an alternative basis for compelling arbitration. *See* Point II, *infra*. This Court has held numerous times that a generic choice of law provision does not incorporate a state's arbitration rules – as opposed to its substantive decisional law – unless the agreement expressly evidences the parties' intent to do so. And here, while the DSP Agreement expressly incorporates the FAA as the body of law controlling the issue of arbitration, it does not mention the WUAA or reference Washington law in regards to arbitration. *See id.*

But even if Washington law applied to the issue of arbitration, the arbitration clause is nonetheless unenforceable. *See* Point III, *infra*. As a preliminary matter, the DSP Agreement's fleeting reference to the rules of the American Arbitration Association ("AAA") does not evidence the parties' clear intent to delegate threshold issues of arbitrability to the arbitrator where, as here, the DSPs' proprietors are not sophisticated or otherwise familiar with complex contracts. *See* Point III.A, *infra*. In any event, the DSP Agreement's arbitration clause is voidable under Washington law because it is both procedurally and substantively unconscionable. *See* Point III.B.

Accordingly, because the DSP Agreement is exempt from arbitration under the FAA, and because Washington law does not provide an alternative basis for compelling arbitration (to the extent Amazon raises this argument on appeal), this Court respectfully should reverse the district court.

## ARGUMENT

## I. The District Court Erred in Concluding that Plaintiffs Are Subject to Mandatory Arbitration Under the FAA

### A. Relevant Statutory Background

In enacting the FAA, Congress did *not* intend to privilege arbitration agreements, but aimed simply to place their enforceability *on the same footing* as any other contractual provision.[8] "The FAA generally provides that arbitration agreements 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Rittmann*, 971 F.3d at 909 (quoting 9 U.S.C. § 2).

"The FAA, however, exempts certain contracts from its scope." *Id.* Specifically, the FAA excludes from its coverage "contracts of employment of seamen, railroad employees, *or any other class of workers engaged in foreign or*

---

[8] *See Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) (FAA's purpose is to "place [arbitration] agreements upon the same footing as other contracts," and to "make arbitration agreements as enforceable as other contracts, *but not more so*.") (cleaned up); *see also id.* at 1714 ("The federal policy [underlying the FAA] is about treating arbitration contracts like all others, *not about fostering arbitration*.").

22

*interstate commerce*." 9 U.S.C. § 1. In interpreting the Exception, the Supreme Court has held that: (i) the term "contracts of employment" encompasses independent contractor relationships, *see New Prime, Inc. v. Oliveira*, 139 S. Ct. 532, 539-41 (2019); and (ii) the Exception applies to contracts of employment of transportation workers involved in interstate commerce, *see Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 106, 114-15 (2001); *see also Rittman*, 971 F.3d at 915 ("we conclude that § 1 exempts transportation workers who are engaged in the movement of goods in interstate commerce, even if they do not cross state lines.").

## B. The DSP Agreement Qualifies Under the FAA's Exception to Mandatory Arbitration

Against this backdrop, the DSP Agreement is exempt from mandatory arbitration under the Exception if: (i) the work the DSPs performed constitutes qualifying transportation work; and (ii) the DSP Agreement constitutes a contract of employment. With respect to the first issue, it is undisputed that the DSPs – including all their personnel – performed transportation work covered by the Exception. *See* Point I.B.1, *infra*. Thus, the only issue in dispute is whether the DSP Agreement constitutes a "contract of employment." As discussed below, the conclusion that it is a contract of employment is compelled by the Exception's plain language and purpose, pertinent case law, and common sense. *See* Point I.B.2, *infra*.

### 1. There is No Dispute that the DSPs and all Their Personnel Engaged in Interstate Transportation Work

There is no dispute that the DSP Agreement obligates the DSPs to perform transportation and delivery work. (ER-50 (DSP Agreement's introduction stating: "This Delivery Service Partners Agreement . . . governs *the transportation, delivery, and related services* performed by the business entity that you represent.")). Nor is there any dispute that all the DSPs' workers – including their proprietors and delivery personnel – engaged in transportation work that plays a "necessary role in the free flow of goods" across borders, and therefore falls within the Exception's scope. *Circuit City*, 532 U.S. at 121; *see also Rittmann*, 971 F.3d at 919.

Indeed, Amazon did not even contest this issue before the district court – arguing *only* that the DSP Agreement did not constitute a "contract of employment" because DSPs are not natural persons, (ER-27–31, 91–94) – and therefore has waived any arguments to the contrary. *See In re Mortgage Elec. Registration Sys., Inc.*, 754 F.3d 772, 780 (9th Cir. 2022) ("arguments not raised in the district court will not be considered for the first time on appeal").

Even in the absence of waiver, however, any arguments concerning the work performed by the DSPs' delivery personnel is foreclosed by *Rittmann*, which concluded that virtually identical work performed by Amazon's "flex drivers" satisfies the Exception. *See* 971 F.3d at 919, *cert. denied* 141 S. Ct. 1374 (2021);

*see also Miller v. Amazon.com, Inc.*, No. 21 Civ. 00204, 2021 WL 5847232, at \*4-6 (W.D. Wash. Dec. 9, 2021) (following *Rittmann*).

Similarly, numerous courts have held that the work performed by individuals who manage, supervise, and/or assist with transportation/deliveries – such as the DSPs' proprietors – is similarly covered by the Exception.[9]  This is especially the case where, as here, the DSP owners themselves frequently assisted with the loading of the vans, and made deliveries when needed.  (ER-40–41 ¶¶ 9-11; ER-43–44 ¶¶ 10-11; ER-46 ¶ 9); *see also Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1789 (2022) (holding that airline ramp supervisor was a qualifying transportation worker because she, at times, assisted with the loading and unloading of cargo).[10]

## 2. The DSP Agreement Is a "Contract of Employment" Within the Meaning of the Exception

### i. The Exception's Plain Language Supports Plaintiffs' Position

The first step in determining whether the phrase "contracts of employment of" transportation workers encompasses agreements to hire business entities, is an

---

[9] *See*, *e.g.*, *Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 593 (3d Cir. 2004); *Zamora v. Swift Transp. Corp.*, No. 07 Civ. 00400, 2008 WL 2369769, at \*1, 7 (W.D. Tex. June 3, 2008); *Liss v. Exel Transp. Servs., Inc.*, No. 04 Civ. 2001, 2005 WL 8161076, at \*7 (D. Ariz. Sept. 30, 2005).

[10] In so ruling, the Supreme Court declined to address whether purely supervisory workers fell within the Exception, although several courts have held that they do. *See* n.9, *supra*.

analysis of the statutory text. *Ross v. Blake*, 578 U.S. 632, 638 (2016) ("Statutory interpretation, as we always say, begins with the text . . . ."); *Invesco High Yield Fund v. Jecklin*, 10 F.4th 900, 903 (9th Cir. 2021) ("[W]e begin as we do for all questions of statutory interpretation, by turning to the text") (internal quotations omitted). Although the Supreme Court has not yet addressed this precise issue, its precedents interpreting that language nonetheless present valuable guideposts.

In *New Prime*, the Supreme Court held that the term "contracts of employment" included independent contractor relationships, such as the one established by the DSP Agreement. *See New Prime*, 139 S. Ct. at 534. Crucially, in reaching its holding, the Supreme Court explained that "Congress used the term 'contracts of employment' in a *broad sense* to capture *any contract for the performance of work by workers*." *See id.* at 541. Here, the DSP Agreement fits easily within this definition, since it establishes an independent contractor relationship and, as noted above, there is no dispute that the DSP Agreement is a contract "for the performance of [qualifying transportation] work by workers." *Id.*; *see also* Point I.B.1, *supra*.

Nonetheless, the district court appears to have concluded that the language modifying "contact of employment" – *i.e.*, that it be "*of* seamen, railroad workers, or [transportation workers]," 9 U.S.C. § 1 – means that the party to the contract necessarily must be one of those workers. But this is wrong on its face. The

26

Exception *does not* say that the contract must be "executed," "signed," or "entered into" by one of those workers. Rather, both common usage of the word "of," as well as Supreme Court precedent, make clear that the Exception's focus *is not* the legal status of the signatory to the contract, but the contract's substance: *i.e.*, whether the contract is for work to be performed by workers falling within one of the Exception's specified categories.

Specifically, dictionaries from the time of the FAA's enactment defined "of" to mean "concerning" or "related to." Noah Webster, *Webster's Practical Dictionary* 271 (ed. 1910).[11] Similarly, in *Circuit City*, the Supreme Court discussed a qualifying contract in terms of whether it was one "*involving* the specific exempted categories [of workers] set forth in § 1." *Circuit City*, 532 U.S. at 122; *Cent. States, Se. and Sw. Areas Pension Fund v. Cent. Cartage Co.*, 84 F.3d 988, 992-93 (7th Cir. 1996) (exception applies to contracts "*covering* transportation workers").

Again, the DSP Agreement falls comfortably within this framework because it establishes an independent contractor relationship that indisputably involves/concerns/relates to the performance of qualifying transportation work by the DSPs' personnel. In fact, the contract in *New Prime* was between the defendant

---

[11] *See also* 3 William Dwight Whitney, *The Century Dictionary: An Encyclopedic Lexicon of the English Language* 4087 (ed. 1914) (entry 12 defining "of" to mean "[c]oncerning; in regard to; relating to; about"); *Webster's Collegiate Dictionary* 670 (3d ed. 1919) (defining "of" to mean, *inter alia*, "related to, or connected with").

trucking company *and the transportation worker plaintiff's limited liability company*, *see Oliveira v. New Prime, Inc.*, 857 F.3d 7, 17 (1st Cir. 2017), and several circuit courts have held that the Exception applies to contracts between an employer and a labor union which, by definition, is not a natural person.[12]

The district court, however, gave *New Prime* short shrift because the issue of whether the Exception covers business entities was not before the Supreme Court. (ER-14). But that observation, while correct, is irrelevant. The point is that the identity of the parties to the contract in *New Prime* was a fact in the record and the Supreme Court did *not deem that fact sufficiently pertinent* to mention even in *dicta*, unlike the First Circuit, which identified it as a potentially complicating factor. *See Olivera*, 857 F.3d 7 at 17.

Similarly, the district court's bid to distinguish the labor union cases on the grounds that a labor union purportedly is not a business entity misses the point. (ER 16 n.5). A labor union is not a natural person, but a legal entity with an existence distinct from the individuals it purports to represent. Thus, the district court's ruling

---

[12] *See*, *e.g.*, *Cent. Cartage Co.*, 84 F.3d at 992-93; *United Elec., Radio & Mach. Workers of Am. v. Miller Metal Prods., Inc.*, 215 F.2d 221 (4th Cir. 1954); *Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers of Am.*, 207 F.2d 450 (3d Cir. 1953); *Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Emps. of Am., Local Div. 1210 v. Pa Greyhound Lines, Inc.*, 192 F.2d 310 (3d Cir. 1951).

– which limits the Exception to contacts involving flesh-and-blood individuals – is irreconcilable with those decisions.

Accordingly, because the DSP Agreement is a contract of employment relating to the performance of work by qualifying transportation workers, it falls squarely within the Exception's ambit.

> ### ii. The District Court's Ruling Undermines the Exception's Purpose, and Is Irreconcilable with this Court's Decisions in *Romero* and *Rittmann*

Although the Exception's legislative history is scant, the Supreme Court has observed that Section 1 embodies Congress's "demonstrated concern" that agreements involving transportation workers who play a "necessary role in the free flow of goods" across state borders be exempt from mandatory arbitration. *Circuit City*, 532 U.S. at 121.

In other words, Congress drew a distinction between "workers in general" who are subject to mandatory arbitration under the FAA, and transportation workers who are exempt. *Id.* at 119-21 (noting that Congress "reserve[ed] for itself more specific legislation for those engaged in transportation"). The district court, however, failed to grasp that excluding contracts, like the DSP Agreement, from the Exception's coverage, would ultimately lead to the *eradication* of this distinction. This is because it would permit all companies that hire transportation workers to avoid the Exception by following Amazon's blueprint and insisting that their

workers form, and then contract through, intermediary business entities, thus subjecting them to the FAA *like all other workers*. [13]

Indeed, it cannot be reasonably disputed that if Amazon had contracted with any of the DSPs' personnel directly *for the exact same work*, those agreements would be subject to the Exception. *See* Point I.B.1, *supra*. Yet Amazon now claims that the Exception is inapplicable, simply because it required the individuals that it recruited to create intermediary business entities as a precondition to participating in the DSP Program. Functionally, this is no different than if Amazon had dealt directly with the individuals it recruited, and then required them to sign contracts waiving the Exception, something this Court has already held is impermissible. *See Romero*, 9 F.4th at 1101 ("[T]he FAA's transportation workers exemption cannot be waived by the terms of a private contract."); *see also Rittmann*, 971 F.3d at 919 (same).

For many of the same reasons, the district court's ruling is irreconcilable with *Rittmann*. There, the Court held that the Exception applied to Amazon's so-called "flex drivers" – independent contractors that provided services virtually indistinguishable from the DSPs – and therefore they could not be compelled to

---

[13] This concern is especially pressing, given the ease with which even unsophisticated parties can form business entities without the aid of a lawyer by using relatively inexpensive, over-the-counter products. *See*, *e.g.*, https://www.legalzoom.com/; https://www.swyftfilings.com/incorporate/california.

arbitrate under the FAA.  *Rittmann*, 971 F.3d at 917-19.  However, if the district court's decision stands, Amazon can avoid *Rittmann*'s holding entirely, simply by requiring its flex drivers to form and contract through intermediary business entities, as it did with its DSPs.

Notably, other courts have rejected analogous attempts by entities to shield themselves from statutory obligations/rights by requiring workers to form intermediary businesses.  *See*, *e.g.*, *Acosta v. Jani-King of Okla., Inc.*, 905 F.3d 1156, 1158-59 (10th Cir. 2018).   In *Acosta*, the Secretary of Labor alleged that the defendant company violated the Fair Labor Standards Act ("FLSA") for workers it hired to provide janitorial services pursuant to franchise agreements.  The defendant, like Amazon here, required its workers "to form corporate entities, which then [became] the named parties to the franchise" agreement.  *Id.* at 1158.  In denying the defendants' motion to dismiss, the Tenth Circuit rejected the argument that the imposition of an intermediary company created a buffer that rendered the FLSA inapplicable.  *See id.* at 1158-59.[14]

---

[14] The district court's ruling allowing Amazon to circumvent the Exception through its facile interposition of business entities is also inconsistent with Supreme Court precedent recognizing corporations as persons with the same rights as individuals under the law.  *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) (providing an expanded interpretation of corporate personhood).

Finally, it is telling that the district court did not explain how its holding –
which would force transportation and delivery workers to arbitrate simply because
the party with superior bargaining power required them to form intermediary
business entities – advances the Exception's purpose. (ER-9–21).

### iii. The District Court's Distinction Between "Contracts of Employment" and "Commercial Agreements" Is Contrary to the Facts of this Case and Exalts Form Over Substance

The central thesis underlying the district court's decision is that the DSP
Agreement is not a "contract of employment" but rather a run-of-the-mill
"commercial agreement between business entities." (ER-17). Although the district
court did not formulate any standards for differentiating between these purportedly
distinct categories, it stressed that the DSPs were "independently owned and
operated businesses" that purportedly "hire[d] their own transportation workers."
(ER-13, 16 (internal quotations omitted)).

As discussed below, however, the undisputed facts make clear that the DSPs
are not "independent" business, but are utterly dominated by Amazon, and all the
DSPs' personnel are functionally Amazon employees.

*First*, the DSP Program *is the opposite* of a normal commercial relationship,
where existent companies agree to do business. Amazon did not engage preexisting
business entities, and, in fact, *expressly forbid* preexisting businesses from applying
to the DSP Program. *See* Statement of the Case at Point I.A, *supra*. Rather, Amazon

recruited individuals and then required approved applicants to create entirely new business entities as a buffer. *See id.* (*see also* ER-40 ¶ 3, ER-42 ¶ 3, ER-45 ¶ 3, ER-151, 153). Also, unlike traditional arms-length business relationships, Amazon trained the proprietors of these purportedly "independent" businesses for three weeks *to teach them how to operate those businesses*. (ER-152, 155).

Thus, not only does each DSP business entity owe its existence to Amazon, in practice each DSP is fundamentally indistinguishable from its proprietor. In this regard, although Amazon's position *in this case* is predicated on the DSPs being wholly separate and distinct from their proprietors, Amazon has taken the contrary position *in other actions*. For example, in *The Clei Grp. LLC. v. Amazon Logistics, Inc.*, No. 22 Civ. 1749 (S.D. Tex. May 31, 2022), the DSP's proprietor asserted FLSA claims on his own behalf in addition to asserting claims on behalf of the DSP. *See id.*, First Amended Complaint ¶¶ 181-200 (June 1, 2022), ECF No. 1. Tellingly, ALI moved to compel arbitration with respect to all claims, *including the DSP proprietor's individual claims*, even though the DSP proprietor himself was not a party to the DSP Agreement. *See id.*, ALI's Motion to Dismiss the Amended Complaint, at 11-12 (Aug. 4, 2022), ECF No. 16. In other words, a DSP's status as a purportedly distinct business entity matters only when it is convenient to Amazon's litigation posture.

33

*Second*, unlike normal commercial agreements between independent, arms-length businesses, Amazon controlled virtually all aspects of the DSPs' operations. *See* Statement of the Case at Point I.C, *supra*. Indeed, Amazon's Program Policies established mandatory "Insurance requirements," "Vehicle specification requirements," "Branding requirements," "Delivery device requirements," "Eligibility requirements for your company's employees," "Wage, Hour and Benefit Requirements," "Standard of professional conduct," "Service Level Standards," "Driver Qualification Requirements," and "Incident Reporting Requirements." (ER-71–80).

*Third*, in light of the above, the DSPs' personnel were functionally Amazon employees. Amazon set hiring standards, had approval authority over the DSPs' hiring decisions, and instructed the DSPs when to discipline or terminate their personnel. *See* Statement of the Case, at Point I.C, *supra*. Amazon set compensation levels for the DSPs' personnel and determined which DSP employees were entitled to bonuses. *See id.* Amazon established mandatory dress codes, grooming standards, and codes of conduct. *See id.* Finally, Amazon monitored the DSPs' personnel's performance in real time – via location-tracking software and other applications Amazon required them to download on their cell phones – and communicated work instructions directly to the DSPs' personnel on a daily basis.

*See id.* Accordingly, regardless of the test that is applied,[15] the level of control Amazon exercised over the DSPs' personnel, and their complete dependence on Amazon, establishes that Amazon is their true employer (or at least a co-employer).

Thus, the DSP entities that Amazon required the individuals it recruited to form were just a façade intended to create the illusion of separateness between Amazon and the DSPs' personnel. As such, the district court's failure to grapple with *any* of the above facts was clearly erroneous, especially considering that the district court's ruling relied heavily on the DSPs' purported independence from Amazon. *See NASA Servs., Inc.*, 957 F.3d at 1041 n.1 (reversing the district court's order compelling arbitration where it did not construe the facts in the light most favorable to the non-moving party); *see also Totten v. Kellogg, Brown & Root*, 152 F. Supp. 3d 1243, 1249 (C.D. Cal. 2016) (in deciding motion to compel arbitration,

---

[15] Depending on the nature of the claims at issue, Washington courts apply the state equivalent of the federal "economic realities test," or the common law "control test," to determine whether an employment relationship exists. *See*, *e.g.*, *Becerra v. Expert Janitorial, LLC*, 332 P.3d 415, 420-21 (Wash. 2014) (applying "economic reality" test to claims under Washington's Minimum Wage Act, which examines, *inter alia*: (i) the "nature and degree of control of the workers;" (ii) the "degree of supervision, direct or indirect, of the work;" (iii) the "power to determine the pay rates or the methods of payment of the workers;" (iv) the "right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers;" and (v) "[p]reparation of payroll and the payment of wages"); *Hollingbery v. Dunn*, 411 P.2d 431, 435 (Wash. 1966) (discussing similar "factors or elements which should be taken into consideration[,]" but stressing "control" as the most important one).

the court is required to "constru[e] all facts and reasonable inferences that can be drawn from those facts in a light most favorable to the non-moving party").

### iv. The District Court's and Amazon's Remaining Arguments Are Meritless

The district court also heavily relied on the purported absence of cases applying the Exception to entities other than natural persons. (ER-17). As an initial matter, this observation – even if true – merely reflects the fact that this appeal raises an entirely novel issue. Indeed, in the nearly 100-year history of the FAA, the district court and Amazon were *only able to muster a grand total of three district court decisions* – all from outside this Circuit – for the proposition that the Exception does not apply to business entities. In any event, the district court is incorrect since, as noted above, several circuit courts of appeal have applied the Exception to contracts with labor unions, which are not natural persons. *See* Point I.B.2.i, *supra*. In any event, none of the cases the district court based its ruling upon are convincing. (ER-15).

In *Carter O'Neal Logistics, Inc. v. FedEx Ground Package Sys., Inc.*, No. 17 Civ. 02799, 2020 WL 13111153 (W.D. Tenn. Mar. 19, 2020), the court's discussion of whether the Exception applied to business entities was *dicta*. *See id.* at *4. Additionally, the court stressed that the contract at issue there, unlike the DSP Agreement, expressly stated that "[t]he Parties agree that they intend to create by this Agreement *a business-to-business relationship, not one of employment*." *Id.* In

*R&C Oilfield Servs., LLC v. Am. Wind Transp. Grp.*, 447 F. Supp. 3d 339 (W.D. Pa. 2020), the court emphasized that the defendant, unlike Amazon here, did *not* dictate how the plaintiff performed the services at issue. *See id.* at 347 (noting that there was no allegation that the defendant specified which of the plaintiff's employees would perform the services at issue). And *D.V.C. Trucking, Inc. v. RMX Global Logistics*, No. 05 Civ. 00705, 2005 WL 2044848 (D. Colo. Aug. 24, 2005) was decided more than a decade before *New Prime*'s broad construction of the term "contracts of employment." *See* Point I.B.2.i, *supra*.

Finally, although not a basis for the district court's ruling, Amazon argued that applying the Exception to the DSP Agreement would result in a massive expansion of the Exception. This is not so. The utter dearth of cases addressing this issue, despite the FAA being in existence *for almost a century*, belies such floodgate concerns. In fact, a ruling in Plaintiffs' favor would be *incredibly narrow* and easily limited to situations where, as here: (i) the agreement at issue established an employment or independent contractor relationship; (ii) the defendants recruited *individuals* and then required them to form *new* business entities as artificial intermediaries; (iii) the defendants controlled all aspects of the services provided by those entities; and (iv) all the work performed by *every* natural person associated with those business entities constitutes interstate transportation work within the

37

meaning of the Exception. Indeed, these key facts are not present in any of the cases the district cited in support of its holding.

*     *     *     *     *

Accordingly, the Court respectfully should hold that the DSP Agreement is exempt from arbitration under the Exception and reverse the district court's order compelling arbitration under the FAA.

## II. Amazon Cannot Rely on Washington Law to Salvage the District Court's Erroneous Arbitration Order

Although the district court did not address the issue, Amazon extensively argued that even if the FAA is inapplicable, Plaintiffs can be compelled to arbitrate under the WUAA, (ER-31–33, 94–96), and it is sure to raise the same argument in defense of the district court's ruling on appeal. As discussed below, however, the WUAA does not provide an alternative basis to compel arbitration. Rather, the DSP Agreement – which Amazon unilaterally drafted – makes clear that the arbitration issue is governed solely by the FAA while the substantive, decisional law applicable to Plaintiffs' claims is Washington law.[16]

---

[16] Washington does not recognize or permit common law arbitration. *Godfrey v. Hartford Cas. Ins. Co.*, 16 P.3d 617, 621 (Wash. 2001). Rather, arbitration in Washington is statutory and controlled by the WUAA. *See Rimov v. Schultz*, 253 P.3d 462, 465 (Wash. Ct. App. 2011). Therefore, to prevail, Defendants must establish that the DSP Agreement incorporated the WUAA.

38

### A. This Court's Precedents Concerning Choice of Law Provisions in Agreements that Include Arbitration Clauses

In this Circuit, "there is a strong default presumption that the Federal Arbitration Act, *not state law* supplies the rules for arbitration" and to "overcome that presumption, [the] parties to an arbitration agreement *must evidence a 'clear intent' to incorporate state law rules for arbitration*." *Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 386 F.3d 1306, 1311 (9th Cir. 2004) (cleaned up).[17] "[A]bsent any other indication of the parties' intent, a general choice-of-law clause *applies state substantive law*, while the FAA governs arbitration procedure that affects the allocation of decisional authority between courts and arbitrators." *Golden*, 2016 WL 4168853, at *12.

Indeed, this Court has held that even where an agreement *makes no mention of the FAA* and contains a "governing law" provision specifying state law, the FAA nonetheless controls and is not supplanted or supplemented by state arbitration law absent a clear statement to the contrary. *See Sovak*, 280 F.3d at 1269-70; *see also Golden*, 2016 WL 4168853, at *8.

---

[17] *See Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1269 (9th Cir. 2002) ("[T]he strong default presumption is that the FAA, not state law, supplies the rules for arbitration"); *Golden v. O'Melveny & Meyers LLP.*, No. 14 Civ. 8725, 2016 WL 4168853, at *8 (C.D. Cal. Aug. 3, 2016) (same).

The arbitration clause at issue in this case is, in fact, a combination of a "Governing Law" provision and a "Submission to Arbitration" provision. (ER-54 ¶ 13). The first sentence of that provision supplies the governing law:

> This Agreement is governed by the United States Federal Arbitration Act, applicable United States federal Law, and Washington state law, without reference to any applicable conflict of laws rules.

*Id.* The remainder of the provision sets forth the agreement to arbitrate and makes no mention of Washington law. *See id.*

## B. The DSP Agreement Does Not Evidence the Requisite Clear Intent to Incorporate the WUAA

Against this backdrop, Amazon's contention that the DSP Agreement's generic reference to "Washington state law" evidences a *clear* intent to incorporate the WUAA in addition to the FAA, fails for no less than three reasons.

*First,* this Court has repeatedly held that a generic choice-of-law provision – *even if embedded in an arbitration clause* – is insufficient to incorporate state procedural, arbitration rules in the absence of a specific reference to those rules. *See Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1212 (9th Cir. 1998) (holding that governing law provision that selected California law, but that did "not contain a *specific reference to the state arbitration rule at issue*," did not incorporate state arbitration law).

Here, although the DSP Agreement's "Governing Law; Submission to Arbitration" provision expressly incorporates the FAA, it *does not* mention the

40

UWAA or otherwise state that Washington law pertaining to arbitration agreements applies in addition, or as an alternative, to the FAA. *See id.* As the cases discussed below demonstrate, this failure is fatal to Amazon's position.

In *Fid. Fed. Bank*, this Court considered an "arbitration clause" that provided as follows:

> Disputes or controversies shall be submitted to and resolved by binding arbitration in accordance with the laws of the State of California and the Rules of the American Arbitration Association.

386 F.3d at 1312. The defendant argued that the provision "expresse[d] the clear intent of the parties to incorporate California's arbitration rules." *Id.* at 1311-12. The Court, however, rejected defendant's argument, and "interpret[ed] the agreement . . . to elect state substantive law but federal procedural law," and therefore held that the FAA alone governed issues relating to arbitration. *Id* at 1312.

Similarly, in *Sovak*, the Court addressed the parties' agreement "to arbitrate all disagreements in Chicago pursuant to Illinois law and the rules of the American Arbitration Association." *Sovak*, 280 F.3d at 1268. The Court held that, although the parties to an agreement can select "state law rules for arbitration," a "general choice-of-law clause *within an arbitration provision* does not trump the presumption that the FAA supplies the rules for arbitration." *Id.* at 1269-70. Accordingly, the

Court "interpret[ed] the choice-of-law clause as simply supplying state substantive, decisional law, and not state law rules for arbitration." *Id.*[18]

So too here, *Wosley*, *Fid. Fed. Bank*, and *Sovak* squarely foreclose Amazon's argument and compel the conclusion that the DSP Agreement's generic reference to "Washington state law" merely provides the substantive, decisional law for any non-federal claims. In fact, the argument that the FAA alone governs the parties' agreement to arbitrate *is even stronger* here than it was in those cases.

In both *Fid. Fed. Bank* and *Sovak*, the state choice-of-law provision was embedded *in the same sentence* as the parties' agreement to arbitrate and there was *no reference to the FAA.* Here, the sentence of the DSP Agreement that references "Washington state law" *does not* contain the promise to arbitrate, and the agreement expressly incorporates the FAA. For this reason, it is unsurprising that Amazon conceded before the district court that the FAA governs the issue of arbitration. (ER-91 ("Pursuant to the Agreement's *express terms*, *the FAA governs* the Agreement, including *the arbitration provisions*.")).[19]

---

[18] *See also Golden*, 2016 WL 4168853, at *13 ("Under Ninth Circuit law, the Agreement's general choice-of-law clause *does not* evidence the parties' clear intent to apply California law to supply the procedural rules of arbitration").

[19] *See also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995) (analyzing compound choice-of-law/arbitration provision and rejecting argument that the "juxtaposition of the two clauses suggests that the contract incorporates 'New York law relating to arbitration.'").

Notably, the main authorities Amazon relied on before the district court –
*Palcko* and *Romero v. Watkins and Shepard Trucking, Inc.*, No. 20 Civ. 55768, 2021
WL 3675074 (9th Cir. Aug. 20, 2021) – undermine Amazon's position. (ER-95).
Specifically, the agreement in *Palcko*, like the one at issue here, expressly
incorporated the FAA. *See* 372 F.3d at 596. However, *unlike here*, the *Palcko*
agreement "itself envisioned the possibility that" it "would be deemed exempt from
the FAA's coverage" and expressly "provided for that contingency," stating "[t]o
the extent that the Federal Arbitration Act is inapplicable, *Washington law
pertaining to agreements to arbitrate shall apply*." *Id.*

This Court's decision in *Romero* is similarly inapt. As an initial matter,
*Romero* concerned a choice of law provision located in a standalone agreement
dealing *solely with the issue of arbitration*. *See Romero*, 9 F.4th at 1099 (companion
decision noting that the "Arbitration Policy *is a stand-alone agreement*"). Thus, by
definition, whatever law the agreement selected necessarily concerned the issue of
arbitration.

In any event, that agreement expressly stated that if the FAA was deemed
inapplicable, then Nevada state law would govern. *See Romero,* 2021 WL 3675074
at *2 ("Where the FAA does not apply, the Arbitration Policy selects Nevada law.");
*Romero*, 9 F.4th at 1099 (companion decision noting that the agreement provided
that if it is "not subject to and governed by the FAA, then the laws of the State of

43

Nevada" apply). Thus, *unlike* the DSP Agreement, the agreements at issue in *Palcko* and *Romero* expressly instructed that state arbitration rules applied in the alternative if the FAA was deemed inapplicable.

Further still, as evidenced by the arbitration clauses Amazon drafted in other cases, Amazon knows full well how to properly incorporate state arbitration rules in the event the FAA is deemed inapplicable, *but simply failed to do so here*. *See*, *e.g.*, *Miller*, 2021 WL 5847232, at *2 (discussing Amazon's amended arbitration provision applicable to its flex drivers, which states "[i]f, for any reason, the [FAA] is held by a court of competent jurisdiction not to apply to Section 11, [which is the arbitration clause] the law of the State of Delaware will govern Section 11 of this Agreement.")

*Second*, Amazon's reading of the DSP Agreement's choice-of-law provision is contrary to its plain language. Specifically, despite including a generic reference to "United States federal law," the provision *nonetheless expressly incorporates the FAA*. The clear implication being that the DSP Agreement's generic reference to Washington law, without any reference to the WUAA, was not intended to incorporate Washington arbitration law.

This conclusion is bolstered by the fact that the DSP Agreement *does not* provide any hierarchy concerning the application of the FAA versus the WUAA. Unlike the agreements in *Palcko*, *Romero*, and *Miller* – which clearly incorporated

state arbitration rules and expressly stated that such rules applied *only if the FAA was deemed inapplicable* – the current agreement provides no such instruction. As such, if Amazon's position were accepted, the DSP Agreement would leave the parties and an adjudicator guessing as to which Act's rules governed or how to resolve any conflicts between the Acts. The untenability of Amazon's position speaks for itself.

*Third*, to the extent Amazon argues on appeal that the choice-of-law provision is ambiguous, that argument fails for two reasons. As an initial matter, by claiming ambiguity, Amazon would be conceding that the DSP Agreement does not "evidence a 'clear intent' to incorporate state law rules for arbitration." *Fid. Fed. Bank*, 386 F.3d at 1311. In any event, as this Court has explained, in addressing whether the parties to a contract intended to incorporate Washington arbitration rules, the reviewing court is required to construe any ambiguities *against the drafter*, *i.e.*, Amazon.[20] Thus, having drafted "an ambiguous document, [Amazon] cannot now claim the benefit of the doubt." *Mastrobuono*, 514 U.S. at 63.

---

[20] *See Rittman*, 971 F.3d at 920 ("Because it is not clear that the parties intended to apply Washington law to the arbitration provision in the event the FAA did not apply, we construe ambiguity in the contract against Amazon"); *see also Mastrobuono*, 514 U.S. at 62 (analyzing issue of whether choice-of-law provision governed arbitration and noting that defendants "cannot overcome the common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it.").

Accordingly, because the DSP Agreement does not clearly incorporate the WUAA, only the FAA governs arbitration.

## III. Even if Washington Law Applies, the Arbitration Provision Is Unenforceable Because It Is Unconscionable

As discussed below, even if Amazon is correct that Washington law, in addition to the FAA, governs the agreement to arbitrate, the DSP Agreement's arbitration clause is nonetheless unenforceable under Washington law because it is unconscionable and contrary to public policy.

### A. The District Court Erred in Determining that the Parties Clearly and Unmistakably Delegated Threshold Issues of Arbitrability to the Arbitrator

As a preliminary matter, the district court erred in concluding that the DSP Agreement's fleeting reference the American Arbitration Association's ("AAA") rules – which merely provide that an arbitrator has the authority to arbitrate issues of arbitrability that are presented to it – constituted a "clear and unmistakable" intent to delegate threshold arbitrability issues, such as unconscionability, to the arbitrator. (ER-10, 18–19  (citing *Brennan v. Opus Bank*, 796 F.3d 1125, 1130, 1132-33 (9th Cir. 2015)).

Putting aside that *Brennan*, respectfully, appears to be an artifact of the arbitrate-at-all-costs mentality that the Supreme Court recently eschewed,[21] several district court's and numerous post-*Brennan* district court decisions in this Circuit have limited *Brennan* to circumstances where the party opposing arbitration was "legally sophisticated" or experienced with complex contracts.[22]

Here, neither the district court nor Amazon has produced *any* evidence that the DSPs are sophisticated. In fact, just the opposite: Amazon's DSP Program marketing materials make clear that Defendants recruited individuals – none of whom were required to have prior delivery or logistics experience – to form new, start-up delivery companies that Amazon described as "small businesses," and who joined the program by scrolling through an online, click-through Agreement drafted

---

[21] *See Morgan*, 142 S. Ct. at 1713 (emphasizing that "policy favoring arbitration . . . is about treating arbitration contracts like all others, *not about fostering arbitration*" and that a courts role is not adopt whatever rule would lead to the most arbitrations).

[22] *See*, *e.g.*, *Dupler v. Orbitz, LLC*, No. 18 Civ. 2303, 2018 WL 6038309, at *3 n.1 (C.D. Cal. July 5, 2018); *see also MacClelland v. Cellco P'ship*, No. 21 Civ. 08592, 2022 WL 2390997, at *3 (N.D. Cal. July 1, 2022); *Ingalls v. Spotify USA, Inc.*, No. 16 Civ. 03533, 2016 WL 6679561, at *3-4 (N.D. Cal. Nov. 14, 2016); *Money Mailer, LLC v. Brewer*, No. 15 Civ. 1215, 2016 WL 1393492, at *2 (W.D. Wash. Apr. 8, 2016); *Magill v. Wells Fargo Bank, N.A.*, No. 21 Civ. 01877, 2021 WL 6199649, at *5 (N.D. Cal. June 25, 2021); *Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1253 (N.D. Cal. 2019); *Vargas v. Delivery Outsourcing, LLC*, No. 15 Civ. 03408, 2016 WL 946112, at *7 (N.D. Cal. Mar. 14, 2016); *Mikhak v. Univ. of Phoenix*, No. 16 Civ. 00901, 2016 WL 3401763, at *5 (N.D. Cal. June 21, 2016); *Meadows v. Dickey's Barbeque Rest. Inc.*, 144 F. Supp. 3d 1069, 1078-79 (N.D. Cal. 2015).

exclusively by Amazon. Additionally, the applicants Amazon accepted were so unsophisticated that Amazon had to provide them with three weeks of training to teach them how to run their DSPs. (ER-152, 155).

Further underscoring the DSP proprietors' lack of business sophistication, Amazon touted that it had *already negotiated* numerous ancillary agreements on the DSPs' behalf, including contracts for delivery vehicles, uniforms, handheld tracking devices, personnel recruitment tools, and payroll and accounting services. (ER-152, 157).

Thus, this case is highly analogous to *Meadows*. There, the district court held that a franchise agreement's reference to AAA rules was insufficient evidence of delegation because the franchisees: (i) were "far less sophisticated" than the defendant corporation; (ii) did not have any legal training or experience with complex contracts; and (iii) were asked to sign a contract containing a myriad of legal terms that was drafted solely by the defendant corporation and offered on a take-it-or-leave-it basis. *See Meadows*, 144 F. Supp. 3d at 1078-79 (citing *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1282 (9th Cir. 2006)).

This Court should similarly limit *Brennan* to cases involving indisputably sophisticated parties and hold that the DSP Agreement's passing reference to the AAA's rules was not "clear and unmistakable" evidence of delegation.

**B.    The DSP Agreement Is Substantively and Procedurally Unconscionable Under Washington Law**

### 1.  Law Regarding Arbitration and Unconscionability

Under Washington law, "[g]eneral contract defenses such as unconscionability may invalidate arbitration agreements." *McKee v. AT&T Corp.*, 191 P.3d 845, 851 (Wash. 2008).  Washington courts "recognize[] two types of unconscionability for invalidating arbitration agreements, procedural and substantive." *Burnett v. Pagliacci Pizza, Inc.*, 470 P.3d 486, 494 (Wash. 2020). "Either type of unconscionability alone is sufficient to void a contract." *JZK, Inc. v. Coverdale*, No. Civ. 46465–9, 2016 WL 236481, at *9 (Wash. Ct. App. Jan. 19, 2016) (citing *Gandee v. LDL Freedom Enters., Inc.*, 293 P.3d 1197, 1199 (Wash. 2013)); *see also Mayne v. Monaco Enters., Inc.*, 361 P.3d 264, 267 (Wash. Ct. App. 2015) (same).  As discussed below, the DSP Agreement's arbitration provision is unenforceable on both grounds.

### 2.  The Arbitration Provision Is Procedurally Unconscionable

"Procedural unconscionability applies to impropriety during the formation of the contract . . . ." *Burnett*, 470 P.3d at 494.  "A contract is 'procedurally unconscionable' when a party with unequal bargaining power lacks a meaningful opportunity to bargain . . . ." *Id*. at 495; *see also Adler v. Fred Lind Manor*, 103 P.3d 773, 782-84 (Wash. 2004) (same).

In assessing whether there "was a lack of meaningful choice" Washington courts consider, *inter alia*, the following factors: (i) the manner in which the contract was created; (ii) whether each party had a meaningful opportunity to understand the terms of the contract; and (iii) whether important terms were obscured in fine print. *Burnett*, 470 P.3d at 495. "[T]hese three factors [should] not be applied mechanically without regard to whether in truth a meaningful choice existed." *Cornelius v. Alpha Kappa Lambda*, 502 P.3d 910, 915 (Wash. Ct. App. 2021) (quoting *Zuver v. Airtouch Commc'ns, Inc.*, 103 P.3d 753, 760 (Wash. 2004)).

"The fact that a contract is an adhesion contract" is also a relevant consideration in assessing procedural unconscionability. *Burnett*, 470 P.3d at 495; *see also Adler*, 103 P.3d at 782 n.7. "An adhesion contract exists if a standard printed contract was prepared by one party on a 'take it or leave it' basis with no genuine bargaining equality between the parties." *Mayne*, 361 P.3d at 267 (quoting *Zuver*, 103 P.3d at 760).[23] Here, there can be no serious dispute that the DSP Agreement is an adhesion contract. (ER-40 ¶ 4, ER-42–43 ¶ 4, ER-46 ¶ 4).

---

[23] An adhesion contract is procedurally unconscionable where it is accompanied by "'*some* evidence that the employer refused to respond to [the plaintiff's] questions or concerns, placed undue pressure on [the plaintiff] to sign the agreement without providing her with a reasonable opportunity to consider its terms, *and/or that the terms of the agreement were set forth in such a way that an average person could not understand them*.'" *Mayne*, 361 P.3d at 267-68 (quoting *Zuver*, 103 P.3d at 761).

Against this backdrop, the DSP Agreement's arbitration provision is procedurally unconscionable because: (i) an average person could not understand the arbitration provision's scope/terms; (ii) the DSPs were forced to accept continuous changes to the scope of the arbitration provision under threat of termination from the program; and (iii) Amazon did not provide a reasonable opportunity for the DSPs to ask questions before they endorsed the DSP Agreement.

*First*, an average person could not have meaningfully understood the scope of the DSP Agreement's arbitration provision – which directs that, *inter alia*, disputes regarding the parties' rights and obligations be submitted to arbitration – because Defendants not only had the unilateral right to alter the DSPs' rights and obligations at any time, (ER-50, 558 §§ 1(c), 14), but they also routinely exercised that right, (¶¶ 8, 36, 71, 99). *See Burnett*, 470 P.3d at 494 n.4 (noting that the court did "not disagree" with numerous cases holding that a parties right to unilaterally modify arbitration agreement rendered it "illusory" and unenforceable).

Indeed, assuming *arguendo* that an average DSP understood the kind of disputes that could arise from Amazon's *existing policies*, there was no way for a prospective DSP to meaningfully appreciate – when weighing whether to endorse the DSP Agreement – the kinds of disputes involving *future policies/requirements* that could be forced into arbitration. In other words, absent a crystal ball, there was no way for a DSP to know the full extent of the types of claims for which they were

waiving their right to a judicial forum, because the policies/requirements/terms at issue *did not yet exist*. This issue is not just academic, but critical since the DSPs' claims turn largely on the fact that Amazon continuously moved the goal posts with respect to their rights and obligations under the program. (¶¶ 8, 36, 71, 99).

*Second*, every time Amazon unilaterally modified the DSPs' rights and obligations under the DSP Agreement – and therefore altered the scope of potential disputes covered by the arbitration provision – Plaintiffs could either accept the changes and remain in the DSP program or immediately stop working as a DSP and be held in breach.[24] However, as Washington courts have noted in the context of invalidating arbitration agreements, "[a] choice compelled by the threat of immediate termination is not a meaningful choice." *See Mayne*, 361 P.3d at 269.[25]

---

[24] (ER-55 § 14 ("If your company continues to perform the Services after the effective date of any modification to this agreement, your company agrees to be bound by the modifications. *If your company does not agree to the modifications, your company must stop performing services*.") (block capitalizations omitted); ER-52 § 6(a)(ii) ("Amazon may terminate this agreement" for breaches of the agreement's provisions or Program Policies, which includes the failure to make deliveries).

[25] *See also id.* at 268 (holding that arbitration agreement was procedurally unconscionable where employee, who had already been working for company, lacked a "meaningful choice" because his only options were to decline "to sign the [new arbitration agreement] and immediately end his employment, or he could sign the agreement and continue working."); *Adler*, 103 P.3d at 784-85 (remanding for determination as to whether plaintiff's assent to arbitration agreement was accompanied by threat of termination, which would support procedural unconscionability).

Here, the lack of a meaningful choice is exacerbated by the fact that – at the time the DSPs were required to agree to the numerous modifications of the DSP Agreement or exit the program – they had already made substantial, non-recoverable investments in their businesses. (¶¶ 6, 40, 69).

*Finally*, the arbitration provision is procedurally unconscionable because Amazon did not provide prospective DSPs with a reasonable opportunity to inquire about the DSP Agreement prior to endorsing it. Rather, DSPs had to accept the DSP Agreement *before* Amazon would invite them to their Seattle campus for DSP orientation/training, which was the first time the DSP's proprietors were able to question Amazon regarding their rights and obligations. (ER 42–43 ¶¶ 4-6, ER 46 ¶¶ 4-5).[26]

### 3. The Arbitration Provision Is Substantively Unconscionable

"Substantive unconscionability involves overly harsh or one-sided provisions of an agreement." *Mayne*, 361 P.3d at 267; *Burnett*, 470 P.3d at 496 (same). An arbitration agreement is also voidable as substantively unconscionable where it would violate the forum's strong public policy. *Scott v. Cingular Wireless*, 161 P.3d 1000, 1005-06 (Wash. 2007). Here, the arbitration provision, and the DSP

---

[26] Plaintiff Stelvio migrated from the DSP 1.0 program to the 2.0 program. Defendants provided Stelvio with one week to decide whether to accept the 2.0 DSP Agreement or to exit the program and did not meaningfully respond to Stelvio's questions regarding the changes to the program. (ER-40 ¶¶ 4-5).

Agreement's other provisions that directly affect the arbitration provision, are substantively unconscionable because they are contrary to Washington's strong public policy and are also shockingly one-sided.

### i. The Agreement Violates Washington State Public Policy

The gravamen of this action is that Defendants have intentionally misclassified the DSPs as independent contractors, when they are, in fact, properly considered franchisees, to circumvent the protections the DSPs are rightly entitled to under RCW § 19.100, *et. seq.*, Washington's Franchise Investment Protection Act ("FIPA"). (¶¶ 10-11, 139(c)-(j), 143, 176-190). In this regard, Defendants' DSP program constitutes a systemic, program-wide violation of the FIPA, and, in turn, the Consumer Protection Act ("CPA"). *Id.*; *see also* RCW § 19.100.190 (violations of the franchisee's bill of rights, RCW § 19.100.180, constitute violations of the CPA). As discussed below, the arbitration agreement violates strong Washington public policy, because its class action waiver and related limitation on equitable relief would preclude the DSPs from effectively stopping Amazon's ongoing, systemic violations of the CPA and FIPA.

Numerous Washington courts, including the Washington Supreme Court, have stressed that private actions under the CPA are indispensable to protecting the public from "unfair and deceptive acts and practices in commerce." *Scott*, 161 P.3d at 1005. This is because "[c]onsumers bringing actions under the CPA *do not merely*

*vindicate their own rights*; *they represent the public interest . . . .*"  *Id.* at 1006; *see also Dix v. ICT Grp, Inc.*, 161 P.3d 1016, 1022 (Wash. 2007) (same).

Given the CPA's public interest focus, Washington Courts have recognized that class actions are often indispensable to the effective enforcement of the CPA. *See Scott*, 161 P.3d at 1005 ("Class remedies not only resolve the claims of the individual class members but can also strongly deter future similar wrongful conduct, which benefits the community as a whole.").[27]  For this reason, Washington courts routinely hold that arbitration clauses barring class actions are substantively unconscionable where they would serve to significantly "forestall[] attempts to vindicate consumer rights" under the CPA.  *Id.* at 1006.[28]

Here, the DSP Agreements' arbitration clause – and, in particular, its class action waiver – is contrary to public policy and therefore substantively unconscionable for no less than four reasons.

---

[27] *See also Dix*, 161 P.3d at 1023 (citing with approval *Am. Online, Inc. v. Super. Ct.*, 108 Cal. Rptr. 2d 699, 712 (Cal. Ct. App. 2001), which held that "[a] class action by consumers produces several salutary by-products, including a therapeutic effect upon those sellers who indulge in fraudulent practices" and avoiding the "burden of multiple litigation involving identical claims.").

[28] *See also McKee*, 191 P.3d at 857-58; *Olson v. The Bon, Inc.*, 183 P.3d 359, 368-69 (Wash. Ct. App. 2008); *Luna v. Household Fin. Corp. III.*, 236 F. Supp. 2d 1166, 1177-79 (W.D. Wash. 2002);  *Townsend v. Quadrant Corp.*, 224 P.3d 818, 825-26 (Wash. Ct. App. 2009) (holding that an arbitration agreement was not substantively unconscionable because it did *not* preclude class actions).

55

*First*, the arbitration clause's class action bar, and the fact that it limits a DSP to obtaining injunctive relief only "on an individual basis" (ER-54 § 13), forecloses a DSP's ability to prevent Defendants' continued violations of the CPA (and FIPA) *on a systemic basis* to protect all DSPs, in violation of Washington's strong public policy. *Scott*, 161 P.3d at 1006 (CPA advances Washington's strong public interests by permitting a plaintiff to obtain "injunctive relief even when the injunction would not directly affect their own private interests."); RCW § 19.86.090 (providing that an injured person "may bring a civil action . . . to enjoin further violations.").

*Second*, by requiring each DSP to individually prove in arbitration that they are franchisees rather than "independent contractors," Amazon is not only attempting to thwart the CPA and FIPA, but is also seeking to avoid a *uniform* holding on this key legal issue and its attendant deterrent effect.[29]  In this regard, Amazon's push for atomized proceedings presents an intolerable risk of inconsistent rulings – where certain DSPs are found to be franchisees and entitled to the FIPA's

---

[29] *See Scott*, 161 P.3d at 1005 (Washington favors CPA class actions for purposes of "efficiency, *deterrence*, and access to justice"); *see also Szetela v. Discover Bank*, 118 Cal. Rptr. 2d 862, 868 (Cal. Ct. App. 2002) ("By imposing this clause on its customers, [Amazon] has essentially granted itself a license to push the boundaries of good business practices to their furthest limits, fully aware . . . that *any remedies obtained will only pertain to that single customer without collateral estoppel effect*.").

protections while others are not – notwithstanding that all DSPs operate under uniform program policies.

*Third*, the arbitration provision would thwart a DSP's ability to prosecute effectively its CPA claim *even on an individual basis*. This is because the arbitration provision purports to narrowly limit arbitral proceedings solely to the immediate, "individual" disputes between a DSP and Amazon, (ER-54 § 13), notwithstanding that a CPA claim requires an examination of Amazon's program-wide misconduct *vis-à-vis* other DSPs.[30]

*Finally*, the DSP Agreement's "Limitation of Liability" provision, which *modifies the arbitration provision* by severely limiting the damages an arbitrator can award, (ER 54 §11), violates public policy because it conflicts with the CPA and would discourage otherwise meritorious actions. *See Szetela*, 118 Cal. Rptr. 2d at 868 (holding that arbitration class action waiver was "harsh and unfair" because, *inter alia*, it "serves as a disincentive for [defendant] to avoid the type of conduct that might lead to class action litigation in the first place.").

---

[30] *See Hernandez v. Johnson & Johnson*, No. 20 Civ. 5136, 2021 WL 320612, at *6 (E.D. Wash. Jan. 8, 2021) (CPA claims look to "whether the acts were part of a *pattern or generalized course of conduct*, whether defendant committed *repeated acts prior to the act involving plaintiff*, whether there is a *danger of repetition of defendant's conduct after the act involving plaintiff*, and the number of consumers likely to be impacted by it.").

Specifically, that provision: (i) precludes DSPs from recovering vast categories of damages, *see* (ER-54 § 11(a)); and (ii) limits Defendants' total potential liability, regardless of the nature of the claim asserted and the actual damages sustained, to "the total amount paid by Amazon to your company for the particular services giving rise to liability in the *six-month period* prior to the event(s) giving rise to the claim." ER-54 § 11(b) (block capitalizations omitted). Those limitations plainly contravene the broad damages available under the CPA, as well as its four-year statute of limitation, and are therefore unconscionable.[31]

### ii. The DSP Agreement Is Shockingly One-Sided

The DSP Agreement's arbitration clause, as well as the agreement's other provisions that modify or impact the arbitration clause, are substantively unconscionable for the additional reason that they are shockingly one-sided. Specifically, although the arbitration clause's class action waiver ostensibly applies to Amazon as well as the DSPs, in practice it serves only to limit the DSPs, since it strains credulity that Amazon ever would (or could) bring class claims against its DSPs. *See Szetela*, 118 Cal. Rptr. 2d at 867 (holding the one-sidedness of

---

[31] *See* RCW § 19.86.090 (permitting recovery of "the actual damages sustained" as well as the opportunity for an additional award of "an amount not to exceed *three times* the actual damages"); *Scott*, 161 P.3d at 1008 (holding provision substantively unconscionable where it "prevents the use of arbitration to vindicate a broad range of statutory CPA rights.").

purportedly mutual class action waiver was "blindingly obvious" because companies "typically do not sue their customers in class action lawsuits").

Relatedly, Amazon, but not the DSPs, possess the unilateral right to modify the DSP Agreements' terms, *including the arbitration clause*. (ER-50, 55 §§ 1(c), 14). Moreover, because the arbitration agreement covers disputes arising under the DSP Agreement, every time Amazon altered the parties' substantive rights and obligations, it necessarily modified the scope of disputes subject to arbitration.

Additionally, the arbitration clause requires a DSP to send Amazon a letter describing the dispute before filing for arbitration – thereby previewing the DSP's claims for Defendants – but it does not similarly obligate Amazon. *See Burnett*, 470 P.3d at 496 (holding arbitration clause substantially unconscionable where, *inter alia*, it required only one of the parties to the agreement to preview its claims to the other party before initiating arbitration proceedings).

Finally, the DSP Agreement's extreme one-sidedness in Amazon's favor also extends to its other provisions that aim to limit the nature of the claims that Plaintiffs can assert in arbitration, as well as the amount of the damages that can be awarded. Foremost, however, is the DSP Agreement's aforementioned "Limitation of Liability," which impacts only the DSPs without any reciprocal limitation on the damages available to Amazon. *Scott*, 161 P.3d at 1008 ("A clause that unilaterally

and severely limits the remedies *of only one side* is substantively unconscionable under Washington law.").

Accordingly, the DSP Agreements' arbitration clause is void because it is substantively unconscionable.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court and hold that Plaintiffs cannot be compelled to arbitrate.

Dated:      February 22, 2023
               New York, NY

                     Respectfully submitted,

                     **KIRBY McINERNEY LLP**

                     By:    */s/ Andrew M. McNeela*
                              Andrew M. McNeela
                              Daniel Hume
                              250 Park Avenue, Suite 820
                              New York, NY 10177
                              Telephone:  212.371.6600
                              Email:  amcneela@kmllp.com
                                         dhume@kmllp.com

                              *Counsel for Plaintiffs-Appellants*

## STATEMENT OF RELATED CASES

In accordance with Ninth Circuit Rule 28-2.6, I hereby state that I am unaware of any related cases currently pending in this Court.

Dated: February 22, 2023

 */s/ Andrew M. McNeela*
 Andrew M. McNeela

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-35818

I am the attorney or self-represented party.

**This brief contains** | 13,802 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Andrew M. McNeela | **Date** | 02/22/2023

*(use "s/[typed name]" to sign electronically filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                  *Rev. 12/01/22*

62

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing Brief of Appellants to be electronically filed on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Electronic Filing system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Appellate Electronic Filing system.

Dated: February 22, 2023

 */s/ Andrew M. McNeela*
Andrew M. McNeela

**ADDENDUM**

**9 U.S.C. § 1**

§ 1. "Maritime transactions" and "commerce" defined; exceptions to operation of title

"Maritime transactions", as herein defined, means charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in foreign commerce which, if the subject of controversy, would be embraced within admiralty jurisdiction; "commerce", as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation, but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.